*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re N. J. PENDER, Minor.

UNPUBLISHED
July 9, 2019

Nos. 344995; 345008
Wayne Circuit Court
Family Division
LC No. 16-523759-NA

Before: MURRAY, C.J., and SAWYER and REDFORD, JJ.

PER CURIAM.

In Docket No. 344995, respondent father appeals as of right the order terminating his parental rights to NP, his minor child, under MCL 712A.19b(3)(a)(*ii*) (desertion for 91 or more days), (c)(*i*) (conditions that led to adjudication continue to exist), and (g)[1] (failure to provide proper care and custody). In Docket No. 345008, respondent mother appeals as of right the same order terminating her parental rights to NP under the same statutory grounds. Because respondent mother raised an issue regarding the trial court's jurisdiction, we remanded this matter for the limited purpose of affording the trial court an opportunity to develop the factual record to determine whether a child custody determination or child custody proceeding had been conducted in any other state other than Michigan having jurisdiction. *In re NJ Pender*, unpublished order of the Court of Appeals entered April 18, 2019 (Docket Nos. 344995; 345008). The trial court having conducted further proceedings and having memorialized its

---

[1] The Legislature amended MCL 712A.19b(3)(g), effective June 12, 2018, pursuant to 2018 PA 58 so that it now provides, "although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." Although the trial court entered its order terminating parental rights on June 26, 2018, after the effective date, at the evidentiary hearing on May 10, 2018, the trial court applied the previous language of the statute for its decision from the bench. Therefore, we apply the language in force at the time of the trial court's decision.

findings in a memorandum,[2] we now consider respondent parents' respective claims of error. For the reasons stated in this opinion, we affirm.

## I. FACTS

NP was born on February 16, 2016, in Philadelphia when respondent parents visited respondent father's relatives there. Respondent parents returned to New York sometime in 2016 and NP lived separately with his paternal grandmother and his maternal grandfather between when his parents moved from Pennsylvania to New York until sometime around October 2016. During late August or early September 2016, respondent mother took NP with her to Michigan to visit her boyfriend. Around October 23, 2016, respondent mother left approximately nine-month-old NP with her boyfriend and returned to New York because she had a court date in an unrelated matter. On November 10, 2016, NP came into the care and custody of petitioner, the Department of Health and Human Services (DHHS), when respondent mother's boyfriend left NP at a police station because he could no longer care for him. Consequently, the DHHS placed him with foster parents in Michigan.

Petitioner and the police unsuccessfully attempted to locate a relative to care for NP. The DHHS contacted respondent mother shortly after NP came into care but she did not know when she could return to Michigan. Although respondent father lived in New York, he initially could not be found and contacted.[3] The DHHS contacted NP's paternal grandmother who lived in the Bronx, New York, who advised that she had no contact with respondent father because he had a substance abuse problem and was homeless. It took the DHHS over three weeks to locate him. Both respondent parents indicated that they each lacked the financial ability or willingness to return to Michigan to take care of NP. Because the DHHS found no relatives available and able to take NP, it placed him in a licensed foster home.

The DHHS identified respondent mother's aunt and respondent father's mother, both New York residents, as potentially interested relatives for placement. NP's paternal grandmother worked as a social worker. She communicated with the DHHS and indicated that she was willing to care for NP and had an interest in adopting him. She attended the dispositional hearing held on February 22, 2017, but was not called as a witness. Respondent parents did not attend that hearing. The trial court found that a preponderance of the evidence established a statutory basis to exercise jurisdiction and make NP a temporary ward of the court.

The record reflects that NP's grandmother traveled to Michigan several times to attend hearings and visit NP. She submitted an application pursuant to the Interstate Compact on the Placement of Children (ICPC), MCL 3.711 *et seq.*, during May 2017 to initiate the process to obtain approval and authorization to have NP placed in her care and enable her to adopt him.

---

[2] We appreciate Wayne Circuit Judge Christopher Dingell's prompt and diligent efforts to complete the tasks that we requested within the short period given.

[3] The record reveals that petitioner learned that respondent father's paternity had been established during a Friend of Court case in the state of New York.

Her application was submitted to the ICPC's central office for processing. The process took a long time but NP's paternal grandmother obtained approval of her ICPC application shortly before the trial court conducted the termination bench trial held on May 10, 2018.

Despite their living in New York during the pendency of this case, the DHHS arranged for respondent parents to be provided treatment plans and services were made available to them locally in New York through Samaritan Village. Respondent parents failed to participate in services or fully comply with their treatment plans. In the 19 months while this matter proceeded through the trial court and while NP was in a foster home in Michigan, they visited NP only twice when they were present in Michigan to attend hearings in this matter. But otherwise, they made no efforts to contact or communicate with him. At the conclusion of a bench trial held on May 10, 2018, the trial court terminated respondent parents' respective parental rights. The trial court entered its termination order on June 26, 2018. Respondent parents filed separate appeals which were consolidated for purposes of this appeal.

Pursuant to this Court's April 18, 2019 Order, on remand the trial court held evidentiary hearings on May 7, 2019 and May 21, 2019. Respondent parents attended both hearings via telephone. The trial court heard the testimony of respondent father and respondent mother.

Respondent father testified that NP was born in Philadelphia, Pennsylvania where respondent parents lived for four to six-months before moving to the Bronx, New York, where they lived with his mother for three months. Respondent father testified further that NP lived in Philadelphia for four months after his birth before respondent parents moved to New York. Respondent father believed that, once they moved to New York, respondent parents and NP lived with respondent father's mother for about six or seven months. Then they moved out and respondent mother took NP to Michigan.

Respondent father testified that no child custody case or any other proceeding occurred in Pennsylvania or New York. Respondent father testified that he never signed an affidavit of parentage and no custody order or parenting time order had ever been entered by a court regarding NP while he stayed in Philadelphia. He also admitted that no child related proceedings or determinations were made by any court in New York respecting NP.

Respondent mother testified that she never filed any child support or paternity action in Bronx County, New York. She also testified that she did not file any documentation regarding custody or child support in Philadelphia. She acknowledged that NP was born February 13, 2016, in Philadelphia. She affirmed that she lived in Philadelphia for approximately four to six months and then moved to New York. She believed that NP was almost four months old when they moved to New York. Respondent mother clarified that she lived with respondent father's mother for a couple months, or perhaps five or six months. She then went to live with her father for a while and then took NP to Michigan around August or September. When she lived with her father, respondent father was nowhere to be found. She left Michigan to return to New York in October 2016.

The trial court memorialized its determination in a memorandum issued on May 21, 2019, and specified its findings as follows:

Based upon the sworn testimony of [respondent mother and respondent father], the only possible places there might be jurisdiction to file for custody would be Bronx County, New York, and Philadelphia, Pennsylvania, in addition to Michigan. Exhibit 2 from the May 7, 2019 hearing contains all the filings that the Bronx County had regarding the mother and/or the father, and none of them relate to a custody action or order. In the testimony of the mother and the father, neither remembered anything like authorizing or participating in a custody action in New York, Bronx County. Exhibit 1 from the May 21, 2019 hearing has a response from the Pennsylvania equivalent of SCAO that the Philadelphia Court of Common Pleas, Family Division, had no family court cases involving the mother or the father. In the testimony of the mother and the father, neither remembered anything like authorizing or participating in a custody action in Philadelphia, Pennsylvania.

The Office of the Attorney General made verbal inquiries in one other county of New York, Kings County. This was before the mother and father testified that they had never done anything in that county. The verbal response was that there were no custody actions or orders there.

To be safe, the Office of the Attorney General made inquiries in Michigan's Wayne, Oakland and Macomb Counties and reported to the court no custody actions or orders found.

## II. JURISDICTION

### A. STANDARD OF REVIEW

We review de novo whether a court had subject-matter jurisdiction, which is a question of law. *In re Wayne Co Treasurer*, 265 Mich App 285, 290; 698 NW2d 879 (2005). We also review de novo a trial court's interpretation and application of a statute. *Id*. We review de novo issues of statutory interpretation which are questions of law. *Atchison v Atchison*, 256 Mich App 531, 534-535; 664 NW2d 249 (2003). If no factual dispute exists, this Court reviews de novo whether the trial court had jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), MCL 722.1101 *et seq*. *Cheesman v Williams*, 311 Mich App 147, 150; 874 NW2d 385 (2015).

### B ANALYSIS

Respondent mother argues that the trial court lacked jurisdiction to terminate her parental rights. We disagree.

Whether a court has subject-matter jurisdiction is a question of law, and "may be raised at any time, even if raised for the first time on appeal." *Smith v Smith*, 218 Mich App 727, 729-730; 555 NW2d 271 (1996). A court's subject-matter jurisdiction is an "absolute requirement" for a valid judicial proceeding. *In re AMB*, 248 Mich App 144, 166; 640 NW2d 262 (2001). The existence of subject-matter jurisdiction is a question of law. *W A Foote Mem Hosp v Dep't of Pub Health*, 210 Mich App 516, 522; 534 NW2d 206 (1995). Under Michigan law, the plaintiff bears the burden of establishing that the circuit court had subject-matter jurisdiction.

*Citizens for Common Sense in Gov't v Attorney General*, 243 Mich App 43, 50; 620 NW2d 546 (2000). In *Usitalo v Landon*, 299 Mich App 222, 228; 829 NW2d 359 (2012) (quotation marks and citations omitted), this Court explained:

> Subject-matter jurisdiction refers to a court's power to act and authority to hear and determine a case. Subject-matter jurisdiction describes the types of cases and claims that a court has authority to address. This Court explained:
>
>> Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind or character of the one pending; and not whether the particular case is one that presents a cause of action, or under the particular facts is triable before the court in which it is pending, because of some inherent facts which exist and may be developed during the trial.
>
> The Michigan Constitution provides:
>
>> The circuit court shall have original jurisdiction in all matters not prohibited by law; appellate jurisdiction from all inferior courts and tribunals except as otherwise provided by law; power to issue, hear and determine prerogative and remedial writs; supervisory and general control over inferior courts and tribunals within their respective jurisdictions in accordance with rules of the supreme court; and jurisdiction of other cases and matters as provided by rules of the supreme court. [Const 1963, art 6, § 13.]
>
> MCL 600.605 defines circuit court jurisdiction as follows:
>
>> Circuit courts have original jurisdiction to hear and determine all civil claims and remedies, except where exclusive jurisdiction is given in the constitution or by statute to some other court or where the circuit courts are denied jurisdiction by the constitution or statutes of this state.

Under MCL 600.605, the trial court had original subject-matter jurisdiction over this case unless another statute provided otherwise. MCL 712A.2(b)(1) authorizes trial courts to exercise jurisdiction in proceedings concerning a juvenile under the age of 18 found within the county if the child's parent abandoned the child. The UCCJEA, however, limits the trial court's jurisdiction in cases where the affected child and the respondent parents reside outside of Michigan. The Legislature adopted the UCCJEA in 2002 with the goal of rectifying inconsistent caselaw and to make child custody jurisdiction uniform. *Atchison*, 256 Mich App at 535. The statute provides standards for determining: (1) whether a state could take jurisdiction of a child-custody dispute, (2) whether other states were prohibited from subsequently taking jurisdiction, (3) enforcement of a custody decision, and (4) when modification of a child-custody decision was permitted. *Id*.

> The UCCJEA was designed to: (1) rectify jurisdictional issues by prioritizing home-state jurisdiction, (2) clarify emergency jurisdictional issues to address time limitations and domestic-violence issues, (3) clarify the exclusive continuing

jurisdiction for the state that entered the child-custody decree, (4) specify the type of custody proceedings that are governed by the act, (5) eliminate the term "best interests" to the extent that it invited a substantive analysis into jurisdictional considerations, and (6) provide a cost-effective and swift remedy in custody determinations. [*Id*. at 536.]

In *Cheesman*, 311 Mich App at 151-152, this Court explained:

The UCCJEA prescribes the powers and duties of the court in a child-custody proceeding involving [Michigan] and a proceeding or party outside of this state. Because it is undisputed that defendant resides outside Michigan, this case requires the interpretation and application of the UCCJEA.

\* \* \*

MCL 722.1201(1) is the "exclusive jurisdictional basis for making a child-custody determination by a court of this state." MCL 722.1201(2). MCL 722.1201(1) provides:

Except as otherwise provided in [MCL 722.1204], [which concerns temporary emergency jurisdiction,] a court of this state has jurisdiction to make an initial child-custody determination only in the following situations:

(a) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

(b) A court of another state does not have jurisdiction under subdivision (a), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 207 or 208, and the court finds both of the following:

(*i*) The child and the child's parents, or the child and at least 1 parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

(*ii*) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

(c) All courts having jurisdiction under subdivision (a) or (b) have declined to exercise jurisdiction on the grounds that a court of this state is the more appropriate forum to determine the custody of the child under section 207 or 208.

(d) No court of another state would have jurisdiction under subdivision (a), (b), or (c).

Additionally, "[p]hysical presence of, or personal jurisdiction over, a party or a child is neither necessary nor sufficient to make a child-custody determination." MCL 722.1201(3). [Some quotation marks and citation omitted; alterations in the original.]

The UCCJEA defines the term "home state" as:

the state in which a child lived with a parent or a person acting as a parent for at least 6 consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than 6 months of age, the term means the state in which the child lived from birth with a parent or person acting as a parent. A period of temporary absence of a parent or person acting as a parent is included as part of the period. [MCL 722.1102(g).]

For purposes of the UCCJEA, the term "child-custody proceeding" means:

a proceeding in which legal custody, physical custody, or parenting time with respect to a child is an issue. Child-custody proceeding includes a proceeding for divorce, separate maintenance, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear. Child-custody proceeding does not include a proceeding involving juvenile delinquency, contractual emancipation, or enforcement under article 3. [MCL 722.1102(d).]

The UCCJEA defines the term "commencement" as the filing of the first pleading in a child custody proceeding. MCL 722.1102(e). Under MCL 722.1102(d), this case constituted a child custody proceeding under the UCCJEA because it involved the determination of legal and physical custody of NP and the termination of respondent parents' parental rights to NP.

Under the circumstances presented at the commencement of this case, the trial court properly exercised temporary emergency jurisdiction under MCL 722.1204 which provides:

(1) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

(2) If there is no previous child-custody determination that is entitled to be enforced under this act and if a child-custody proceeding has not been commenced in a court of a state having jurisdiction under sections 201 to 203, a child-custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under sections 201 to 203. If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under sections 201 to 203, a child-custody determination made under this section becomes a final child-custody

-7-

determination, if that is what the determination provides and this state becomes the home state of the child.

(3) If there is a previous child-custody determination that is entitled to be enforced under this act or if a child-custody proceeding has been commenced in a court of a state having jurisdiction under sections 201 to 203, an order issued by a court of this state under this section must specify in the order a period of time that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under sections 201 to 203. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires.

(4) If a court of this state that has been asked to make a child-custody determination under this section is informed that a child-custody proceeding has been commenced in, or that a child-custody determination has been made by, a court of a state having jurisdiction under sections 201 to 203, the court of this state shall immediately communicate with the other court. If a court of this state that is exercising jurisdiction under sections 201 to 203 is informed that a child-custody proceeding has been commenced in, or a child-custody determination has been made by, a court of another state under a statute similar to this section, the court of this state shall immediately communicate with the court of the other state. The purpose of a communication under this subsection is to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.

Under MCL 722.1204(1), the trial court properly exercised temporary emergency jurisdiction because respondent mother abandoned[4] NP in Michigan and he needed emergency protection. Because the record discloses that Michigan did not constitute NP's home state under the UCCJEA and neither respondent parent resided in nor was a citizen of Michigan, the trial court did not initially have authority to exercise jurisdiction other than temporary emergency jurisdiction over this matter. The plain language of MCL 722.1204(2), (3), and (4), indicates that the trial court had the obligation to make further inquiry to determine whether it had authority to exercise continuing jurisdiction to make final child custody determinations in this case. The trial court needed to determine whether a previous child custody proceeding had been commenced in a court of another state having jurisdiction under MCL 722.1201 to MCL 722.1203.

Following remand, the trial court inquired and obtained evidence that establishes that NP had no "home state" as defined by MCL 722.1102(g) and no other court of any state had exercised jurisdiction over NP or respondent parents respecting any child custody proceeding. The record evidence establishes that no child custody proceeding as defined by MCL 722.1102(d) had been commenced in any other state. Because NP had no home state, and no child custody proceeding within the meaning of MCL 722.1102(d) existed, the trial court was not

---

[4] "Abandoned" means left without provision for reasonable and necessary care or supervision. MCL 722.1102(a).

statutorily precluded from exercising continuing jurisdiction and entering final custody orders in this case. Under MCL 722.1201(1)(d), no court of another state would have had jurisdiction under subdivisions (a), (b), or (c). Therefore, the trial court could appropriately exercise jurisdiction and render final child custody determinations. Further, because a child custody proceeding had not been commenced in a court of a state having jurisdiction under sections MCL 722.1201 to 722.1203, pursuant to MCL 722.1204(2), the trial court appropriately exercised jurisdiction and had authority to render child custody determinations, and its determinations in this case became final child custody determinations. Accordingly, respondent mother's claim that the trial court lacked jurisdiction to terminate her parental rights lacks merit.

In relation to this claim of error, respondent mother also argues for the first time on appeal that her counsel provided her ineffective assistance by not raising the issue that the trial court lacked jurisdiction under the UCCJEA. We disagree.

"In analyzing claims of ineffective assistance of counsel at termination hearings, this Court applies by analogy the principles of ineffective assistance of counsel as they have been developed in the criminal law context." *In re Simon*, 171 Mich App 443, 447; 431 NW2d 71 (1988). To preserve an ineffective assistance of counsel claim, a defendant must move for a new trial or an evidentiary[5] hearing in the trial court. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). In this case, respondent mother failed to move for a new trial or an evidentiary hearing in the trial court, so this issue was not preserved for appeal. *Id*. Because respondent mother failed to raise a claim of ineffective assistance of counsel in a motion for a new trial or request for an evidentiary hearing, we review this issue for errors apparent on the record. *People v Armisted*, 295 Mich App 32, 46; 811 NW2d 47 (2011).

"The principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings; therefore, it must be shown that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). The second prong requires a showing that a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different. *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007). Effective assistance of counsel is presumed, and the respondent bears the heavy burden of proving otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). The respondent must overcome the strong presumption that the attorney's performance constituted sound trial strategy. *In re Martin*, 316 Mich App at 85.

In this case, as discussed above, the trial court properly exercised emergency temporary jurisdiction upon respondent mother's abandonment of NP in Michigan. Further, under the facts presented in this case, the trial court had authority under the UCCJEA to exercise continuing jurisdiction and enter final child custody determinations. Therefore, respondent mother has failed to establish the factual predicate for her claim of ineffective assistance of counsel. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999) (the defendant raising a claim of ineffective

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

assistance of counsel bears the burden of proving the factual predicate of his or her claim). Moreover, "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). The record in this case does not support respondent mother's assertion that but for counsel's errors the result of the proceeding would have been different. *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). Therefore, respondent mother has failed to establish ineffective assistance of counsel in this regard.

## III. REASONABLE EFFORTS

### A. STANDARD OF REVIEW

We review for clear error a trial court's decision regarding reasonable efforts. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made. *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016). "When reviewing the trial court's findings of fact, this Court accords deference to the special opportunity of the trial court to judge the credibility of the witnesses." *In re Fried*, 266 Mich App at 541 (citation omitted). We review de novo questions of statutory interpretation. *In re Keillor*, 325 Mich App 80, 85; 923 NW2d 617 (2018).

### B. ANALYSIS

Respondent father argues that the trial court erred in terminating his parental rights because petitioner failed to make reasonable efforts to preserve the family by not placing NP with his paternal grandmother and by failing to provide interstate transportation. Respondent mother also argues that the trial court erred and violated her due-process rights by not placing NP with his paternal grandmother. Both arguments lack merit.

A trial court may not terminate parental rights unless the parents were given a meaningful opportunity to participate in services. *In re Mason*, 486 Mich 142, 156-160; 782 NW2d 747 (2010). Petitioner must make reasonable efforts to rectify the conditions that led to its involvement in the case. *In re Terry*, 240 Mich App 14, 25-26; 610 NW2d 563 (2000). Reasonable efforts at reunification are made through a parent agency agreement or case service plan. MCL 712A.18f(3); *In re Mason*, 486 Mich 142, 156; 782 NW2d 747 (2010). Reasonable efforts include caseworkers making referrals for services and trying to engage the respondents in services. *In re JL*, 483 Mich 300, 322 n 15; 770 NW2d 853 (2009). "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (citations omitted). "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Laster*, 303 Mich App 485, 495; 845 NW2d 540 (2013) (quotation marks and citation omitted). A parent must meaningfully participate in services provided and benefit from the services offered. *In re Gazella*, 264 Mich App 668, 676; 692 NW2d 708 (2005).

A respondent must challenge the adequacy of services provided by the DHHS in the trial court to preserve the issue for appeal. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569

(2012). To preserve an issue regarding reasonable efforts to reunify, a respondent must object or indicate that the services provided to him were somehow inadequate. *Id*. at 247. "The time for asserting the need for accommodation in services is when the court adopts a service plan." *Id*. at 247 (quotation marks and citation omitted).

The record in this case reflects that respondent father did not challenge the adequacy of the DHHS's reunification efforts until closing argument at the termination hearing held on May 10, 2018, more than a year after the trial court issued its dispositional order. Therefore, respondent father failed to preserve this issue for appeal. Consequently, we review this issue for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). An error affects substantial rights if it caused prejudice by affecting the outcome of the proceedings. *Id*. at 9.

Respondent mother argues for the first time on appeal that the trial court violated her due-process rights by placing NP in foster care and not with his paternal grandmother which created the condition that led to the termination of her parental rights. Where a due process claim is not raised in the trial court, it is unpreserved for appeal. *In re HRC*, 286 Mich App at 450. We review unpreserved constitutional challenges for plain error affecting substantial rights. *Id*.; see also *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). Because respondent mother did not challenge petitioner's placement of NP in foster care or raise any issue before the trial court regarding potential placement with his paternal grandmother, this issue is reviewed under the plain error standard. *Id*.

The Due Process Clause provides protection against government interference with certain fundamental rights and liberties. *In re B and J*, 279 Mich App 12, 22; 756 NW2d 234 (2008). A fundamental liberty interest may not be infringed by the government unless the infringement is narrowly tailored to serve a compelling state interest. *Id*. "[P]arents have a fundamental liberty interest in the companionship, care, custody, and management of their children." *Id*. at 23. To comply with due process, statutory grounds for termination must be proven by clear and convincing evidence. *Id*. "[W]hen the state deliberately takes action with the purpose of 'virtually assur[ing] the creation of a ground for termination of parental rights,' and then proceeds to seek termination on that very ground, the state violates the due process rights of the parent." *Id*. at 19-20.

Respondent mother argues that the DHHS created a condition leading to the termination of her parental rights, namely, placement of NP with foster parents rather than his paternal grandmother. Respondent mother asserts that the DHHS delayed the ICPC process. When a child is removed from the home, the DHHS is required to "identify, locate, notify, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional, and physical needs" within 30 days. MCL 722.954a(2). Within 90 days of removal, the DHHS must make a placement decision in writing. MCL 722.954a(4)(a). Before doing so, it must give consideration and preference to any relatives willing to care for the child, and make a placement decision based on the best interests of the child. MCL 722.954a(5).

Respondent mother asserts that the paternal grandmother immediately expressed interest in placement of the minor child with her. Examination of the record, however, establishes the

inaccuracy of respondent mother's contention. Respondent father also argues that petitioner failed to make reasonable efforts toward reunification because it did not place NP with NP's paternal grandmother in New York City. The record similarly does not support his contention.

The record reflects that when respondent mother's boyfriend left NP at the police station, the DHHS and the police investigated possible relative placements. None were found available. The record reflects that the DHHS identified NP's paternal grandmother and respondent mother's aunt[6] as potential relative placements shortly after taking NP into care after his abandonment. Respondent mother relies on testimony at the adjudicatory hearing held on February 22, 2017, in which Djuana Hampton-Rice, the DHHS foster care worker, advised the trial court that she spoke to NP's paternal grandmother within two days of NP's coming into care. Hampton-Rice testified that the paternal grandmother informed her that respondent father was homeless, and the paternal grandmother had no contact information for him. The record, however, does not reflect that NP's paternal grandmother made a request for NP's placement with her upon NP's removal, nor did she make such request at the February 2017 hearing. NP's paternal grandmother attended the February 22, 2017 hearing but she was not called to testify and she did not make a request that NP be placed with her.

Respondent mother also relies on the testimony of Roselynn Waldowski, another DHHS foster care worker, from the May 10, 2018 evidentiary hearing in which she informed the trial court that, to her knowledge, NP's paternal grandmother made herself available for placement around the beginning of the case. Waldowski, however, did not begin working on this case until April 23, 2017, and the record does not corroborate her statement. The record reflects that it was not until the first dispositional review and permanency planning hearing held on June 2, 2017, that Waldowski informed the court that NP's paternal grandmother sought relative placement through the ICPC. Waldowski advised the trial court that NP's paternal grandmother submitted her ICPC application just three weeks earlier in May of 2017. The record establishes that NP's paternal grandmother did not submit her ICPC application at or even near the commencement of the case. Moreover, as of the next dispositional review and permanency planning hearing on September 8, 2017, NP's paternal grandmother's ICPC application remained pending and a home study still needed to be completed.

The record reflects that Waldowski communicated with NP's paternal grandmother and the ICPC caseworker in this regard. As of the pretrial hearing held on November 29, 2017, NP's paternal grandmother had yet to complete a final interview, and Waldowski hoped to have the paternal grandmother's application result within a few weeks. Although NP's paternal grandmother submitted her application, it remained pending for numerous months precluding placement of NP into foster care with her in New York. Waldowski testified at the May 10, 2018 termination hearing that ICPC applications take a long time to process, sometimes even up to two years. She informed the trial court that NP's paternal grandmother recently obtained approval of her ICPC application and that a Foster Care Review Board meeting was scheduled to

---

[6] The record reflects that respondent mother's aunt did not qualify to serve as an appropriate placement.

consider relative placement of NP with his paternal grandmother who desired to provide NP care and adopt him. The record further indicates that even after the termination of respondent parents' parental rights, despite approval of her ICPC application, the receiving state, New York, had further procedures to complete before giving final approval to placement of NP with his paternal grandmother in New York for foster care or adoption.

Significantly, respondent mother has failed to present anything that corroborates her claim that the DHHS delayed or interfered with NP's paternal grandmother's ICPC application. The record indicates that petitioner made reasonable efforts toward reunification through the ICPC process to assist NP's paternal grandmother's efforts to obtain approval for NP's placement with her. Moreover, the DHHS recommended that NP's paternal grandmother be considered for adoption because it considered her a suitable adoptive placement. The DHHS, therefore, complied with MCL 722.954(a) because investigations were made into relative placement. The trial court was only required to address relative placement as an alternative to termination of parental rights if NP was already in relative placement. See *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012). Because NP had been placed and remained in foster care throughout the pendency of this case, the trial court properly proceeded to terminate respondents' parental rights. Respondent mother's argument that the DHHS created a condition leading to the termination of her parental rights by placing NP with foster parents rather than his paternal grandmother is not supported by the record. The record reflects that the DHHS did not intentionally delay the process, it did not create a condition that led to termination, and it did not violate respondent mother's due-process rights. *In re B and J*, 279 Mich App at 19-20. Neither respondent parent has established plain error affecting their substantial rights.

The record also reflects that the trial court ordered respondent father to participate in parenting classes, have a psychological evaluation, participate in individual counseling, have a substance abuse assessment, submit to drug screens, and maintain suitable housing. The trial court similarly required respondent mother to participate in numerous services including parenting classes, submit to drug screens and undergo substance abuse treatment, have a psychological evaluation and attend individual counseling. Waldowski referred respondent parents for services through Samaritan Village, an agency in the Bronx, New York. Despite efforts made to assist respondent father, he failed to fulfill his treatment plan and made little progress in rectifying the barriers to reunification. He continued to engage in substance abuse, lacked employment and housing, had periods of incarceration, and failed to visit NP or even inquire regarding his welfare. Respondent mother similarly failed to comply with her treatment program until shortly before the termination hearing. Services were offered locally in New York, so she had no travel or transportation barriers impeding her ability to comply with her treatment plan. Nevertheless, respondent mother failed to rectify the barriers that led to NP's removal. Further, at the time of the termination hearing, both respondent parents had not seen or been in contact with NP in almost a year and a half.

The record reflects that respondent parents were in Michigan and visited NP on two occasions, once on December 14, 2016, and again on January 10, 2017. Instead of remaining in Michigan and working to regain custody of NP, respondent parents returned to New York where respondent father lacked housing and a source of income, neglected to engage in the services provided to him, and engaged in activities that led to his confinement. Although the DHHS did not provide respondents interstate transportation from New York to Michigan, the record reflects

that they came to Michigan and the DHHS provided them local bus tickets, transportation to and from the bus station, coats, and food. The record establishes that petitioner made reasonable efforts to reunite respondent parents with NP by providing each of them available services to enable them to rectify their respective barriers and to secure reunification. They each failed to meet their respective responsibilities to participate in the services that were offered and failed to rectify the conditions that led to NP's coming into care. Respondent parents have failed to demonstrate plain error that affected their substantial rights. Therefore, the trial court did not err by finding that petitioner made reasonable efforts toward reunification before respondent parents' respective parental rights were terminated.

## IV. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

We review for clear error the trial court's determination of statutory grounds under MCL 712A.19b(3) for termination of parental rights. MCR 3.977(K); *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). To terminate parental rights, the trial court must find at least one of the statutory grounds for termination in MCL 712A.19b(3) by clear and convincing evidence. *Id*. A factual finding is clearly erroneous if this Court has a definite and firm conviction that a mistake was made. *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). We defer to the trial court's "special opportunity to judge the credibility of witnesses." *Id*. We review de novo questions of statutory interpretation. *In re Keillor*, 325 Mich App at 85.

### B. ANALYSIS

Respondent father argues that the trial court erred by ruling that statutory grounds existed under MCL 712A.19b(3) for termination of his parental rights. We disagree.

The trial court in this case found by clear and convincing evidence that the facts alleged in the petition were true and established grounds for termination under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), and (g), which provide:

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

(a) The child has been deserted under either of the following circumstances:

* * *

(*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial

-14-

dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> \* \* \*

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Once this Court concludes that the trial court did not clearly err by finding one statutory ground for termination, we need not address the additional grounds. *In re HRC*, 286 Mich App at 461.

In this case, the record reflects that respondent father resided in New York. Respondent mother also resided in New York and came to Michigan with NP but abandoned him to the care of her boyfriend who later dropped NP off at the police station. During the pendency of this case, neither respondent parent visited NP from January 2017 until the termination hearing on May 10, 2018. Clear and convincing evidence, therefore, established the statutory ground for termination under MCL 712A.19b(3)(a)(*ii*) because respondent parents deserted NP for 91 or more days and did not seek custody of him during that period.

Respondent father argues that statutory grounds under MCL 712A.19b(3)(a)(*ii*) were not proven by clear and convincing evidence because he was not a part of respondent mother's decision to bring and then leave NP in Michigan, and he faced barriers to visitation including living out of state, incarceration, homelessness, and inpatient drug rehabilitation. We disagree.

The record establishes that respondent parents only visited NP twice since his placement into care, once during December 2016, and once after the pretrial hearing on January 10, 2017. From that time until the May 10, 2018 hearing, neither respondent parent made any effort to contact NP. The trial court ordered that respondents could participate in weekly parenting time but neither of them did so. The record further reflects that respondents failed to call, write, send gifts to him, or express any interest whatsoever in his welfare.

The trial court, therefore, did not err when it concluded that clear and convincing evidence established that respondent father deserted NP and failed to seek custody during the period specified under MCL 712A.19b(3)(a)(*ii*). Accordingly, the trial court did not err by ordering termination of respondent father's parental rights. Because the trial court correctly ruled that clear and convincing evidence established one statutory ground under MCL 712A.19b(3), we decline to consider respondent father's other claims of error in this regard. *In re VanDalen*, 293 Mich App at 139.

-15-

## V. BEST INTERESTS

## A.  STANDARD OF REVIEW

Once a statutory ground for termination has been proven, the trial court must find that termination serves the child's best interests before it can terminate parental rights.  MCL 712A.19b(5); MCR 3.977(E)(4).  A trial court must find by a preponderance of the evidence that termination serves the best interests of the child before it may terminate parental rights.  *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).  We review for clear error the trial court's determination that termination of respondent father's parental rights served NP's best interests.  MCR 3.977(K); *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).  A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made.  *Id*.  We give deference to the "trial court's factual findings at termination proceedings if those findings do not constitute clear error."  *In re Rood*, 483 Mich at 90.  We also defer to the trial court's special opportunity to judge the credibility of witnesses.  *In re HRC*, 286 Mich App at 459.

## B.  ANALYSIS

When considering best interests, the trial court must focus on the child rather than the parents.  *In re Moss*, 301 Mich App at 87.  The trial court may consider several factors including the child's bond to the parent, the parent's parenting ability, and the child's needs for permanency, stability, and finality.  *In re Olive/Metts*, 297 Mich App at 41-42.  The trial court may also consider how long the child lived in the present home and the likelihood that the child "could be returned to [the] parent's home within the foreseeable future, if at all."  *In re Frey*, 297 Mich App at 248-249.  In *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014), this Court stated that the trial court may also consider:

> the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption.  [Citations omitted.]

Further, the child's safety and well-being, including the risk of harm he might face if returned to the parent's care, constitute factors relevant to a best-interest determination.  *In re VanDalen*, 293 Mich App at 142.

Respondent father argues that the trial court erred when it determined that termination of his parental rights served NP's best interests because statutory grounds were not established by clear and convincing evidence, respondent father did not have the means to visit NP in Michigan, he loved NP, and the trial court based its best-interests determination on respondent parents' poverty.  We disagree.

A preponderance of the evidence in this case supports the trial court's decision that termination of respondent father's parental rights served NP's best interests.  The record reflects that the trial court considered all of the evidence in the record and the applicable factors for its best-interest decision.  Review of the entire record establishes that a preponderance of the evidence weighed in favor of finding that termination of respondent father's parental rights served NP's best interests.

In this case, the record reflects that NP had no bond with respondent father or respondent mother because of their long absence from NP's life and failure to maintain any contact with NP after January 2017. The lack of a bond weighed in favor of termination. The record also indicates that respondent father lacked the ability to parent NP. Respondent father had a serious substance abuse problem that hindered his ability to parent. Respondent father's mother testified that he needed time to get his life on track to enable him to parent. This factor weighed in favor of termination.

The record indicates that respondent father failed to comply with the services required under his treatment plan and made available to him by Samaritan Village. Although respondent father recently enrolled in inpatient rehabilitation, he had not completed the program and his long history of substance abuse raised serious concern whether he could maintain sobriety. Respondent father's argument that the trial court based its best-interest determination on his poverty lacks merit. The record reflects that he was provided ample time and resources to comply with his treatment plan but failed to do so. This factor weighed in favor of termination.

The record reflects that NP lived in the present foster home since being abandoned and placed into care. He established a strong bond with his foster parents who indicated their interest in adoption. NP needed special care because of developmental deficits that he suffered as a result of the lack of care provided by respondent parents. His foster parents provide NP the special services to assist his development. The record before the trial court clearly indicated that NP needed permanency, stability, and finality. These factors all weighed in favor of termination.

The record indicates that the trial court considered alternatives to adoption but none were appropriate given NP's young age. The record indicates that NP had two possibilities of adoption available to him. His foster parents and his paternal grandmother indicated their strong interests and abilities to adopt NP. This factor weighed in favor of termination.

The record indicates that the applicable factors favored termination of respondent parents' respective parental rights. The trial court appropriately considered and weighed all of the evidence and correctly found that a preponderance of the evidence supported termination of their parental rights to NP.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent mother also argues that she was denied the effective assistance of counsel because her trial counsel failed to properly communicate with her. We disagree.

Because respondent mother failed to raise a claim of ineffective assistance of counsel in a motion for a new trial or request for an evidentiary hearing, we review this issue for errors apparent on the record. *Armisted*, 295 Mich App at 46. To prove ineffective assistance, respondent mother must establish that her counsel's performance fell below an objective standard of reasonableness, and that the deficient performance prejudiced her. *In re Martin*, 316 Mich App at 85. The second prong requires a showing that a reasonable probability exists that, in the absence of counsel's defective performance, the outcome of the proceedings would have been different. *Odom*, 276 Mich App at 415. Effective assistance of counsel is presumed, and respondent mother bears the heavy burden of proving otherwise. *Vaughn*, 491 Mich at 670.

Respondent mother asserts that trial counsel violated his professional obligations because "he hardly communicated with his client at all." This argument is based on respondent mother's comment at the pretrial hearing held on November 15, 2017, when she said, "I never – I don't think I've been able to get a hold of my lawyer." The trial court took a five-minute break off the record so respondent mother could speak with her counsel. Respondent mother appeared at the pretrial hearing by telephone, and had not appeared in court in person since the January 10, 2017 hearing. Nothing else in the record indicates that trial counsel failed to remain in contact with respondent mother. Respondent mother gave no indication throughout the proceedings or at the termination hearing that she lacked communication with her counsel at any time. The record reflects that respondent mother's counsel appeared at and represented her adequately at all proceedings. We find no error apparent in the record that supports respondent mother's contention that her counsel provided her ineffective assistance. Accordingly, respondent mother has failed to meet her burden.

Affirmed.

/s/ Christopher M. Murray
/s/ David H. Sawyer
/s/ James Robert Redford

-18-